Diana MICKLE, Plaintiff–Appellant,

John R. Williams, Appellant,

v.

Sean MORIN and Ronald Smith, Defendants–Appellees.

Docket No. 01–7308.

United States Court of Appeals, Second Circuit.

Argued: April 3, 2002.

Decided: July 18, 2002.

John R. Williams, New Haven, CT, pro se and for Plaintiff–Appellant.

M. Jeffry Spahr, Office of Corporation Counsel, Norwalk, CT, for Defendants–Appellees.

Before: NEWMAN, KEARSE, and B.D. PARKER, Circuit Judges.

KEARSE, Circuit Judge.

Plaintiff Diana Mickle appeals from so much of a final judgment of the United States District Court for the District of Connecticut, Alan H. Nevas, *Judge*, as dismissed her claims brought under 42 U.S.C. § 1983 against defendants Sean Morin and Ronald Smith, members of the Norwalk, Connecticut Police Department, for the alleged use of excessive force in arresting her. At the close of Mickle's presentation of her case to the jury, Mickle withdrew her claims against other defendants, and the district court granted judgment as a matter of law ("JMOL") in favor of Morin and Smith on the grounds that Mickle's trial testimony was not as credible as that of Smith and Morin and that, in the circumstances, the amount of force used by the officers was the minimum amount needed and was not objectively unreasonable. On appeal, Mickle contends that the court could not properly make credibility evaluations or weigh the evidence in entering judgment against her as a matter of law. In addition, appellant John R. Williams, one of Mickle's attorneys, appeals from an order of the district court sanctioning him in the amount of $500 for failing to comply with a pretrial order. Williams contends that the sanction was unwarranted and was imposed on him without notice and an opportunity to be heard. For the reasons that follow, we vacate both the judgment and the sanctions order and remand to the district court for further proceedings.

## I. BACKGROUND

The present litigation arises out of incidents that occurred on June 16 and June 17, 1998 at the home of Mickle, then a 60–year–old grandmother. At approximately 3 a.m. on June 17, Mickle was arrested by Officer Morin and then-Sergeant Smith, and perhaps a third officer. She was released later that day without being charged. She brought this action under 42 U.S.C. § 1983, alleging, *inter alia*, false arrest, use of excessive force during the arrest, and various violations of state law. All but the claim of excessive force were withdrawn before trial.

At trial, Mickle testified and called Smith and Morin as witnesses. The following accounts of what occurred in the early morning hours of June 17 are drawn from the trial testimony.

### A. The Arrest of Mickle

It is undisputed that on the evening of June 16, 1998, Mickle's daughter Amy Barrow had been arrested after a disturbance

between Barrow and Barrow's son and that Mickle thereafter attempted to call the Norwalk police station, hoping to extricate her daughter or to arrange bail. According to Mickle, when she tried the police station's main telephone number, she reached only an answering machine that had a garbled message; she therefore called 911, explained the problem, and asked the operator to transfer her to the desk sergeant; the operator responded that she could not do so.

Mickle then called 911 again; the exact number of times she called 911 is disputed but is not material to this appeal. Morin was sent to Mickle's home after midnight and knocked; when there was no response, he left. Smith too went to Mickle's home, knocked, received no response, and departed. Thereafter, Smith and Morin together went to Mickle's home; they knocked, rang the doorbell, still received no response, and departed. At about 3 a.m., both Smith and Morin were again dispatched to Mickle's home; according to Morin, the officers were sent because of Mickle's repeated calls to 911 for nonemergency purposes; according to Smith, they were sent because they had been informed that Mickle was intoxicated and they were concerned for the safety of Mickle's 14–year–old grandson.

### 1. Mickle's Version of the Arrest

Mickle testified that she was not intoxicated when the officers arrived at 3 a.m. on June 17. She and members of her family had gone out to dinner on the evening of June 16 to celebrate her grandson's birthday, and they had consumed some champagne and had had wine with dinner; but she had not had an alcoholic beverage since 10 p.m.

Mickle indicated that she had heard Smith and Morin on their first visit to her house in the early morning hours of June 17, but she had not responded because they had not identified themselves as police officers. Prior to their final visit, she had received a call from the 911 operator who alerted her that the officers were coming. Mickle testified that, on that final visit, unbeknownst to her, one officer entered through the back door of her house, which she kept locked; and when there was a knock at the front door and she opened the door a crack,

> [t]here was an officer standing behind the door to the vestibule, hiding behind it. He pulled the door, he grabbed my arm and wrenched it up behind my back and pushed me out into the arms of these two on the stoop and they put a hand cuff on and dragged me out to the car and threw me in.

(Trial Transcript February 5, 2001 ("Tr."), 130.) When they arrived at the police station, Mickle was told to get out of the car but could not because her hands were cuffed behind her and she could not maneuver. The officers pushed and pulled her out of the car and dragged her into the station. Mickle testified that at no point did she use any vulgarity in speaking to the officers. Nor had she attempted to punch or kick anyone.

As a result of the wrenching of her arm, the rotator cuff in Mickle's shoulder was "dislocated," causing her tremendous pain and shock and requiring numerous visits to her doctor and her physical therapist. Mickle also suffered a pinched nerve in her shoulder and developed high blood pressure as a result of the incident. She also testified that the handcuffing had been inappropriately high on her forearms and caused a large hematoma; however, she had suffered little residual pain from the bruising and was complaining principally that the wrenching of her arm sufficiently to damage her rotator cuff constituted force that was excessive. Mickle's doctor

bills as a result of the incident totaled some $3,600. As of the time of trial in 2001, an MRI was being scheduled for the shoulder.

### 2. *The Granting of JMOL*

The final visit by Smith and Morin to Mickle's home, and her ensuing arrest, were described by the district court in a posttrial opinion as follows:

After Smith and Morin left [following their first visit, on which they knocked and rang but received no response], the Norwalk police continued to receive calls on their 911 emergency number. Because of these additional calls, Smith and Morin again returned to Mickle's home at approximately 2:45 a.m. to investigate. Morin knocked on the front door and eventually it was opened slightly by Mickle. Mickle informed Morin that she didn't have to let him in and that he was "a worthless piece of shit." While Morin was talking to Mickle, Smith walked around the perimeter of the residence and found the rear door of the house unlocked. Smith, concerned about the well being of the child who had been left in the custody of his intoxicated grandmother, entered the premises and announced his entry. He entered through the kitchen, where he spotted numerous empty wine bottles and glasses. Smith continued through the hallway and saw Mickle at the front door. Mickle had just slammed the door on Morin and began to turn around as Smith approached her. Smith walked towards Mickle and stated, "Ma'am, why don't you open the door for the officer." Mickle then turned around, and with the closed fist of her right hand, attempted to strike Smith in the head. Smith blocked Mickle's punch and stepped backwards to get out of the way. Mickle's forward momentum caused her to fall to the floor. While Mickle was on the floor, Smith opened the front door for Morin and together they handcuffed her. Both Smith and Morin detected an odor of alcohol on her. Mickle was handcuffed and arrested for breach of peace, criminal mischief, interfering with an officer, and assaulting an officer. Morin and Smith asked Mickle to walk to the police car, but she refused and began digging her heels into the ground. Eventually Mickle went limp and Smith and Morin carried her approximately twenty five to thirty feet to Morin's patrol car.

Once in the car, Mickle verbally berated Morin during the drive to the Norwalk police station. Morin again noticed an odor of alcohol emanating from Mickle while they were driving to the station. Upon arriving at the police station, Mickle refused to peacefully exit the police car. Smith, who had returned to the station in his own patrol car, had to assist Morin in physically removing her from the car. Mickle, again refused to walk and was carried into the police station by Morin and Smith.

Ruling on Motion for Judgment as a Matter of Law, dated February 13, 2001 ("JMOL Ruling") at 3–5.

In ruling that the above evidence entitled Smith and Morin to judgment as a matter of law, the district court stated as follows:

In this case, the evidence shows that, as a matter of law, no reasonable jury could determine that Mickle was subjected to excessive force. Mickle presented no evidence to support her claim that the officers used excessive force. To the contrary, the evidence presented in her case-in-chief revealed that Morin and Smith acted "objectively reasonabl[y]" in light of the circumstances that confronted them. Both Smith and

Morin applied the minimum amount of force necessary to subdue Mickle under the circumstances. Mickle was intoxicated at the time of the arrest, she was abusive and belligerent towards Morin and Smith, she attempted to strike Smith, she resisted arrest, and continuously refused to comply with their request that she walk, and thus they had to carry her. The only evidence presented by Mickle was her testimony that she had been handcuffed and that this caused bruising.

*Id.* at 8.

The court also found that Smith and Morin were entitled to qualified immunity, stating that

the evidence presented at trial revealed that Morin and Smith exercised the minimum amount of force necessary to subdue Mickle who was intoxicated, assaulted Smith, and refused to comply with the officers['] requests. Their actions did not violate clearly established constitutional rights and it was objectively reasonable for them to believe that their actions did not violate those rights.

*Id.* at 11.

The court concluded:

It is for the foregoing reasons, as well as the reasons articulated on the record at trial, that the defendants' motion for judgment as a matter of law as to Morin and Smith was GRANTED.

*Id.* On the record at trial, the district court had stated its reasons for granting Smith and Morin judgment as a matter of law as follows:

In the Court's view, the testimony of the plaintiff is not credible and is inconsistent with the testimony of the officers. The Court finds the officers' testimony to be far more credible than that of the plaintiff and, therefore, the Court directs a verdict in favor of the defendants.

(Tr. 201.)

**B. *Sanctions Against Williams***

As discussed in greater detail in Part II.B. below, on February 7 and 8, 2001, the district court entered two sanctions orders dated February 6, 2001, one against Williams as attorney of record for Mickle, and the other against M. Jeffry Spahr as lead attorney for Smith and Morin, in connection with their respective failures to comply with a pretrial order filed on January 3, 2001 ("January Pretrial Order"). That order required the parties, at various intervals prior to trial, to file, *inter alia,* proposed voir dire questions, a stipulation of the uncontroverted facts, an agreed statement of the contested issues of fact and law, lists of their respective witnesses and exhibits, specifications as to interrogatory answers and deposition passages to be offered at trial, proposed jury instructions, and a special verdict form if one was to be requested. The court found that neither attorney had complied with any part of the January Pretrial Order. It fined Williams $500 and Spahr $100. Each attorney moved to vacate the sanctions order against him. Spahr's motion remains pending in the district court; Williams's motion to vacate was denied.

These appeals followed.

## II. DISCUSSION

On appeal, Mickle contends that in granting judgment against her as a matter of law, the district court erred by making evaluations of credibility and by failing to draw permissible inferences in her favor. Williams contends that the sanctions against him were unwarranted and were imposed without affording him due process. For the reasons that follow, we vacate both the judgment against Mickle and

the sanctions order against Williams and remand for further proceedings.

## A. *The Granting of JMOL Against Mickle*

 The district court may properly grant judgment as a matter of law in a case tried to a jury if "a party has been fully heard on [a dispositive] issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). In reviewing the record to determine whether a motion for JMOL should be granted, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.... 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). JMOL is thus "proper only if 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'" *Fiacco v. City of Rensselaer*, 783 F.2d 319, 329 (2d Cir.1986) (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). And in making this determination, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 151, 120 S.Ct. 2097.

 The Fourth Amendment, which protects against unreasonable seizures, governs a claim that excessive force was used in connection with an arrest. *See Graham v. Connor*, 490 U.S. 386, 388, 391–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In this context, the reasonableness question is whether the officers' actions were "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.* at 397, 109 S.Ct. 1865. As to the substance of such a claim, " '[n]ot every push or shove' " is excessive. *Id.* at 396, 109 S.Ct. 1865 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). However, we have held that where there was testimony that a suspected thief, upon answering the police officer's knock at his door, was shoved to the floor, was immediately cuffed with his hands behind his back, and was kept in that position for five or six hours with the handcuffs unduly tight, despite his complaints, before being taken to the police station, the evidence was sufficient to defeat a motion for judgment as a matter of law. *See Calamia v. City of New York*, 879 F.2d 1025, 1035 (2d Cir.1989). Similarly, sworn assertions that the defendant "pushed" the plaintiff against the inside of the door of her car, "yanked" her out, "threw [her] up against the fender," and "twisted [her] arm behind [her] back," causing bruises lasting a "couple [of] weeks" were sufficient to preclude summary judgment dismissing a § 1983 claim for excessive force. *Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir.1987); *see, e.g., Bellows v. Dainack*, 555 F.2d 1105, 1106 & n. 1 (2d Cir.1977) (similar evidence held sufficient to foreclose judgment as a matter of law after trial); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 150, 120 S.Ct. 2097 ("the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" (quoting *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. at 250–51, 106 S.Ct. 2505)); 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2524, at 249–50 (2d ed.1994) (standard for assessing sufficiency of evidence to create issue of fact for jury is the "same whether it arises in the procedural context of a motion for judgment as a matter of law prior to the submission of the case to the jury or in the context of a renewed motion for judgment as a matter of law after the jury has returned a verdict").

█ In the present case, neither the district court's oral announcement that it was granting JMOL at the close of Mickle's case nor its written decision a week later complied with the above principles. The written decision did not take the evidence presented at trial in the light most favorable to Mickle. Rather, on all conflicting points, that decision appears to have ignored Mickle's testimony entirely. For example, the court stated that "Mickle was intoxicated at the time of the arrest . . . ." JMOL Ruling at 8. Mickle testified, however, that she was not intoxicated and had last consumed alcohol—wine—some five hours earlier. (*E.g.,* Tr. 128, 180–81.) The court stated that Mickle was "abusive and belligerent towards Morin and Smith," JMOL Ruling at 8, and "informed Morin . . . that he was 'a worthless piece of shit,' " JMOL Ruling at 4. Mickle testified, however, that she had not used any profanity toward the officers (Tr. 164–65); and when asked whether she had made that specific quoted statement, Mickle stated that she had not (Tr. 164). The court stated that "[w]hile Morin was talking to Mickle, Smith walked around the perimeter of the residence and found the rear door of the house unlocked." JMOL Ruling at 4. Mickle testified, however, that the officer who had entered her house grabbed her the moment she opened her door a crack; she also testified that her back door

was locked, that it was her practice to keep it locked, and that she had been particularly careful to ensure that it was locked that night because of the upsetting events involving her daughter. (Tr. 130–31.) The court stated that "Smith . . . entered the premises and announced his entry." JMOL Ruling at 4. Mickle testified, however, that at no point did Smith announce his presence in her home. (Tr. 130–31.) The court stated that "Mickle[,] . . . with the closed fist of her right hand, attempted to strike Smith in the head." JMOL Ruling at 4. Mickle testified, however, that she did not hit or swing at any officer. (Tr. 134.)

Thus, in virtually every particular relating to the encounter between Mickle and the officers, the district court made no mention whatever of the testimony of Mickle and adopted a version of the circumstances that was proffered by Smith and/or Morin. As the jury was not required to believe the disputed accounts given by either of the defendants, the court was required to disregard their testimony in ruling on their motion for judgment as a matter of law. The court could not instead embrace defendants' versions of the circumstances as the basis for granting them judgment as a matter of law.

Further, the district court erred in stating that "[t]he only evidence [of force or injury] presented by Mickle was her testimony that she had been handcuffed and that this caused bruising," JMOL Ruling at 8. Mickle testified, in addition, that she had suffered a painfully dislocated rotator cuff; that that injury had required visits to her doctor for which she incurred $3,600 in doctor bills, and required 10 trips to a physical therapist; and that even as late as the time of trial, more than 2½ years after the event, she needed an MRI for her shoulder. (*E.g.,* Tr. 133–34, 136–38.) Whether or not Mickle's terminology—dis-

located rotator cuff—was medically precise, her description was admitted without objection, and a rational juror, crediting Mickle's version of the events, could have inferred that the force used to inflict that injury on a person whose only offense had been repeated nonemergency police-related calls to 911 was excessive.

█ Nor could the court properly grant JMOL for Smith and Morin on the ground that they were entitled to qualified immunity, for it was well established that the use of excessive force in the course of an arrest is constitutionally prohibited, *see generally Graham v. Connor*, 490 U.S. at 396–97, 109 S.Ct. 1865, and "proper application [of the test of reasonableness under the Fourth Amendment] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," *id.* at 396, 109 S.Ct. 1865; *see id.* at 399, 109 S.Ct. 1865 ("The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances ...."). Where the circumstances are in dispute, and "contrasting accounts ... present factual issues as to the degree of force actually employed and its reasonableness," a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity. *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir.2001); *see also id.* at 240 (" '[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness' " (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir.1999))); *Robison v. Via*, 821 F.2d at 924.

The district court here recognized that the objective reasonableness of a given amount of force depends on the circumstances. *See, e.g.*, JMOL Ruling at 8 ("Morin and Smith acted 'objectively reasonabl[y]' *in light of the circumstances that confronted them*. Both Smith and Morin applied the minimum amount of force necessary to subdue Mickle *under the circumstances*." (emphases added)). But it failed to give recognition to the fact that the circumstances were sharply in dispute. For example, in stating that "Morin and Smith exercised the minimum amount of force necessary to subdue Mickle who was intoxicated, assaulted Smith, and refused to comply with the officers['] requests," JMOL Ruling at 11, the court plainly made factual findings as to the circumstances confronting the officers. In contrast to those findings, Mickle's account of the facts was that she was not intoxicated and had done nothing more than make 911 calls and open her door a crack when the officers knocked on her door at 3 a.m. She had not engaged, and did not engage, in any violent conduct. She did not curse at the officers; she did not attempt to strike any of them. She had merely sought to speak by telephone to a live police officer—rather than an answering machine—in an attempt to have her daughter released from custody. Instead, a policeman surreptitiously entered her locked home and grabbed her from behind without warning or provocation, and she was literally dragged off to jail in handcuffs, her arm wrenched out of its socket. A jury as factfinder, of course, would not be required to credit Mickle's version of the events, but it could permissibly do so; and her version, which the court was required to credit in ruling on defendants' motion for judgment as a matter of law, was sufficient to support findings that the force used against Mickle was excessive and that no reasonable police officer could objectively have believed otherwise.

In adopting the defendants' versions of the events, the district court expressly stated that it found those versions to be "far more credible than that of the plaintiff," and that "[i]n the Court's view, the testimony of the plaintiff [wa]s not credible." (Tr. 201.) The granting of JMOL on such a basis is, as discussed above, impermissible.

Accordingly, we reverse the granting of JMOL and remand for a new trial.

## B. *The Imposition of Sanctions Against Williams*

The trial began and ended on February 5, 2001. On February 7 and 8, the district court entered orders dated February 6 imposing sanctions against Williams and Spahr, respectively, for failing to file the stipulations, statements, lists, and requests called for by the court's January Pretrial Order. The sanctions order with respect to Williams stated as follows:

On February 5, 2001, trial before a jury commenced in this court. Neither counsel of record, John R. Williams, Esq. nor his associates who filed appearances on the eve of trial complied with any of the requirements of the court's Pre-trial Order [doc. # 25] filed January 3, 2001. (see attached) The Pre-trial Order expressly states that "[f]or purpose of complying with this order, the jury selection date of February 1, 2001 is the trial date." *See* Court's Pre-trial Order, ¶ 12. Contrary to the requirements of the Pre-trial Order, Mr. Williams did not submit a written stipulation of uncontroverted facts and an agreed statement of the contested issues of fact and law; a list of witnesses; a list of pre-marked exhibits; a joint statement of the case; jury instructions; a list of any interrogatories, answers thereto, or depositions specifying the appropriate portions thereof that plaintiff intends to offer at trial; a special verdict form if one is to be requested; or voir dire questions.

Mr. Williams's failure to comply with the court's Pre–Trial Order is an all-too-common occurrence by Mr. Williams and the members of his firm in cases assigned to the docket of the undersigned. In fact, in almost every case which has gone to trial in this court, the members of his firm have uniformly ignored the court's Pre–Trial Order. The court will no longer excuse this pattern of practice. In light of Mr. Williams's and his firm's present and past failures to respect the court's authority and to obey the court's order, the court now invokes its inherent power to impose sanctions for such conduct. The court is vested with inherent power to police the conduct of attorneys who violate court orders and engage in other conduct that interferes with the court's power to manage its courtroom and may do so without a finding of bad faith. *See United States v. Seltzer*, 227 F.3d 36, 42 (2d Cir.2000).

Accordingly, the court hereby imposes sanctions in the amount of five hundred dollars ($500.00) against John R. Williams for failure to comply with the court's Pre–Trial Order. The fine shall be paid to the Clerk of the Court in Bridgeport, Connecticut, by March 5, 2001.

Order Imposing Sanctions [on Williams], dated February 6, 2001 ("Williams Sanctions Order"), at 1–2. The court's order imposing sanctions on Spahr was similar, but the amount was $100, and it made no reference to any past contumacy.

Williams moved to vacate the order of sanctions against him, complaining in part that the sanctions had been imposed "without any notice or opportunity to be heard, in violation of due process and the rule in this Circuit as most recently articulated in *Mackler Productions, Inc. v. Cohen*, 225

F.3d 136, 141–43 (2d Cir.2000)." (Williams Motion To Vacate Order Imposing Sanctions, dated February 9, 2001 ("Williams Motion"), ¶ 1.)

Williams also argued that the sanctions order was unwarranted because his firm had not intended to disobey the January Pretrial Order; rather, his firm had been informed by defense counsel in mid-January that the required stipulations and lists, etc., were not yet due because the court was to conduct a lengthy trial prior to the trial of the present case.

6. On or about January 15, 2001, an attorney in the firm of the undersigned contacted defense counsel, as required by this court's order of January 3, 2001, for purposes of entering into the agreements required by that order. At that time, defense counsel informed this office that he or his staff had contacted the chambers of Nevas, J., and had been informed that the court's order of January 3, 2001, could be disregarded because the court was going to devote the month of February to the trial of a medical malpractice case and that this case would not be tried until March. Defense counsel further stated that, upon the basis of that advice from chambers, he had no intention of entering into any stipulation or otherwise complying with the court's order.

7. In fact, as this court's records show, defense counsel was true to his word and did not comply with the January 3 order.

8. Although an attorney in the office of the undersigned had by January 15, 2001, completed a significant portion of a draft in compliance with the January 3 order, based upon the representations of defense counsel she stopped working on that matter.

(Williams Motion ¶¶ 6–8.)

Williams also argued that sanctions against him were particularly unwarranted because he was not the trial attorney and did not conduct jury selection, and because "[a]s the court was informed well in advance of the date of jury selection, [Williams] was not even in the United States at the time of jury selection or during the week prior to trial." (*Id.* ¶ 5.)

Spahr similarly moved to vacate the sanction against him, stating, *inter alia,* that he had failed to submit the papers referred to in the court's pretrial order because the pretrial order was ambiguous as to when the papers must be filed and because he was advised by the judge's law clerk that trial of the present case would be delayed because of the impending lengthy trial of another case. He stated that

> [t]he Court is correct in stating that the Pre–Trial Order stated that "(f)or purpose of complying with this order, the jury selection of February 1, 2001 is the trial date".

However, that Order read, in its entirety, as follows:

> "If this case is to be tried to a jury, the date on which trial is expected to begin will be set at jury selection. For purpose of complying with this order, the jury selection date of February 1, 2001 is the trial date. If this case is to be tried to the court, the date set for trial is (blank)".

Accordingly, it appears there is some ambiguity in the Order and/or it appears the Order is incomplete. The last sentence was not completed.

The Defendants were under the impression that this case would not be tried until sometime [in] April, 2001. In fact, a call was made to the Judge's Clerk's office inquiring as to when the case would come up for trial. The Defendants' counsel was informed that this

would not be until April, 2001. The defense counsel expressly indicated that the purpose of the call was to comply with the Court's order.

At the time of jury selection Defendants' counsel had a discussion with the Judge's Clerk. Defendants' counsel raised the topic that the Court's scheduling orders could not be complied with since the medical malpractice case had been cancelled an [*sic*] the trial of the above-captioned matter was set to proceed on February 5, 2001 (rather than April, 2001).

(Spahr Motion To Vacate Order Imposing Sanctions, dated February 13, 2001 ("Spahr Motion"), at 1–2.) Spahr stated that he had meant no disrespect to the court and had at all times proceeded in good faith in accordance with his understanding of the actual timetable. (*E.g., id.* at 3 ("At all times defense counsel was operating in good faith and was communicating with this Court in order to ensure that the Court's Order would be complied with.").)

The court denied Williams's motion to vacate the sanction imposed against him, stating in part as follows.

... Mr. Spahr was sanctioned one hundred dollars ($100.00) for his failure to comply with the court's order. *See* Doc. # 35, Order Imposing Sanctions. (copy attached). The court imposed a smaller sanction on Mr. Spahr because his failure to comply with the court's pre-trial order in this case was an isolated and singular occurrence whereas Mr. Williams's failure to comply in this case was one of many instances of non-compliance.

There is no merit to Mr. Williams's argument that two other attorneys in his office also appeared in this case, and that he is the least responsible for violating the court's order because he did not try the case and was out of the country. This claim overlooks the fact that, up until January 29, 2001, two days before jury selection and seven days before trial, Mr. Williams was the only attorney with an appearance in the case. Significantly, at the time the court-ordered filings were due, Mr. Williams was the only attorney of record. As such, Mr. Williams, a named partner of Williams & Pattis LLC, is the attorney responsible for the violation of the court's pre-trial order and was properly sanctioned.

As previously stated, the court is vested with inherent power to police the conduct of attorneys who violate court orders and engage in other conduct that interferes with the court's power to manage it[ ]s courtroom. The court is authorized to impose sanctions for such conduct and may do so without a finding of bad faith. *See United States v. Seltzer*, 227 F.3d 36, 42 (2d Cir.2000); *see also* D. Conn. L. Civ. Rul. 31(a) ("The Court may impose sanctions directly against counsel who disobey an order of the Court or intentionally obstruct the effective or efficient administration of justice.")

Ruling on Motion To Vacate Order Imposing Sanctions [Against Williams], dated February 15, 2001, at 1–3 ("Order Denying Vacatur") (footnotes omitted). Spahr's motion to vacate the sanction imposed against him has not yet been decided.

■■■ A court has the inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct or for disobeying the court's orders, *see, e.g., Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 49–50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), "[a]s long as [he] receives an appropriate hearing," *id.* at 57, 111 S.Ct. 2123. An award of sanctions under the court's inherent power

must be based on "clear evidence" and must be accompanied by "a high degree of specificity in the factual findings . . . ." *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir.1986) (internal quotation marks omitted), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); *see also United States v. Seltzer*, 227 F.3d 36, 43 (2d Cir.2000) (vacating sanctions order and remanding "for further development of the record" where we were "unable to determine exactly what circumstances gave rise to the district court's decision to sanction").

■ Before imposing sanctions, the court must afford the person it proposes to sanction due process, *i.e.*, "notice and opportunity to be heard." *In re Ames Department Stores, Inc.*, 76 F.3d 66, 70 (2d Cir.1996). An attorney whom the court proposes to sanction "must receive specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on that matter." *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 97 (2d Cir.1997) (attorney "must be forewarned of the authority under which sanctions are being considered, and given a chance to defend himself against specific charges"); *see also United States v. Seltzer*, 227 F.3d at 42–43 (vacating sanctions and remanding for further proceedings where attorney had not been given proper notice and an opportunity to be heard).

■ The award of sanctions against Williams in the present case cannot be sustained on the present record. First, there is no indication that the district court provided Williams with any sort of notice that the court was considering imposing sanctions or with an opportunity to be heard before sanctions were imposed. The importance of such notice and opportunity is exemplified here where, according to both attorneys, counsel had made efforts to determine the due dates of the various required pretrial filings, and there was a misunderstanding as to those dates which Spahr attributed to a conversation he had with the district judge's law clerk.

Further, the amount of the sanction imposed on Williams (five times that imposed on Spahr) was based in part on the court's finding that Williams had failed to comply with pretrial orders in the past; thus Williams was entitled to notice that included identification of the past cases in which the court believed there had been such failures, in order to allow him to respond. No such notice was provided; nor did the court identify those cases in its sanctions order or in its order refusing to vacate the sanctions. Rather, the court referred only generally to "many instances of non-compliance," Order Denying Vacatur at 2, or "almost every case which has gone to trial in this court" or a "pattern of practice" of noncompliance, or failures that were "an all-too-common occurrence," Williams Sanctions Order at 2. In sum, the district court failed to accord Williams due process, and its findings of fact lack the "high degree of specificity" needed to substantiate an order of sanctions.

Accordingly, we vacate the order of sanctions against Williams and remand for further proceedings.

## CONCLUSION

We have considered all of defendants' arguments on this appeal in defense of the entry of judgment in their favor as a matter of law and have found them to be without merit. The judgment dismissing Mickle's excessive force claim is vacated, and the matter is remanded for a new trial. We also vacate the order imposing sanctions against Williams and remand for further proceedings if the district court elects to pursue the matter. We express

no view on the merits of either the case or the sanctions orders.

Costs are awarded to plaintiff on her appeal; each side shall bear its own costs with respect to the appeal of Williams.