Lawson v. Brown's Home Day Care Center, Inc., No. 195-9-97 Cacv (Teachout, J., Jan. 29, 2003)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**
**CALEDONIA COUNTY, SS.**

KATHERINE LAWSON & BRADLEY LAWSON,  :
 individually, and as parents and guardians of their :  Caledonia Superior Court
 daughter, JORDAN LAWSON       :  Docket No. 195-9-97 Cacv
                 :
                 v.
                   :
                   :
BROWN'S HOME DAY CARE CENTER, INC., and :
LUCILLE M. NELSON & ROBERT NELSON, JR.:

**Upon Remand from the Vermont Supreme Court**

**MEMORANDUM OF DECISION**

By Entry Order reported at 172 Vt. 574 (2001), this case was remanded to the undersigned trial judge for further proceedings. Appellant Duncan F. Kilmartin, Esq., through his attorney Robert R. Bent, Esq., filed a memorandum of law on the remand issues, and a hearing was held on September 25, 2002 at which time the court heard additional evidence and oral argument.

At issue is a sanction imposed by the court on Attorney Kilmartin, one of Defendants' attorneys, for filing with the court information from a confidential mediation session. In its Memorandum Decision, the Vermont Supreme Court upheld the court's inherent power to sanction, but held that "[a] finding of bad faith is essential to the court's power to impose the sanction it did." *Id.* at 576. It remanded the case for the trial court to address Attorney Kilmartin's stated justification for making the filing, and to make a finding on whether the conduct was done in bad faith. "Kilmartin is entitled to some explanation why the reasons for the disclosure were not only wrong, but so wrong that they were advanced in bad faith." *Id.* The Court concluded: "On remand, if the court finds that Kilmartin revealed the mediation materials in bad faith, then a sanction would be an appropriate exercise of the court's inherent powers." *Id.* at 578.

1

For the reasons set forth below, the court finds that the filing by Attorney Kilmartin of confidential information from a mediation session during the course of settlement negotiations was done in bad faith, and that such bad faith is the basis of the sanction imposed by the court. The decision of the court delivered from the bench at the close of the sanctions hearing on September 2, 1998 did not include a detailed explanation of why the court did not accept Attorney Kilmartin's justification for his conduct, nor did it include a specific statement of a finding of bad faith. Attorney Kilmartin has now had the opportunity to present additional evidence in support of his position, as well as present additional argument, and the court has had the benefit of both, as well as the memorandum decision of the Supreme Court and opportunity for further research. The current finding is based on the additional evidence and arguments in addition to the record as of September 2, 1998, and is informed by the memorandum decision of the Supreme Court.

The court's consideration of this issue was, and is, founded on a presumption of good faith. Attorney Kilmartin has advanced as justification for his conduct that his purpose was "to disclose unethical conduct and/or potentially criminal conduct and to disqualify the opposing lawyer." *Id.* at 576. As noted by the Supreme Court, this appears on its face as a plausible justification. Furthermore, the record is devoid of direct statements manifesting bad faith. Under these circumstances, it is incumbent on this court to analyze the proferred justification in the light of all of the facts and circumstances, starting from the presumption of good faith and using an objective standard in analyzing those facts and circumstances, and to explain clearly any conclusion that the conduct was done in bad faith.

The conduct of Attorney Kilmartin at issue occurred within the context of a pattern of conduct between him and opposing counsel Attorney Gareth Caldbeck that developed early in the lawsuit and continued throughout the life of the case. The facts of the underlying case are tragic and heartbreaking. Jordan Lawson, a toddler, choked on a rattle that had become lodged in her throat while she was at Brown's Home Day Care Center, which was operated by the Defendants. By the time the rattle was removed, she had severe brain damage, required significant care, and faced permanent disability. Jordan and her parents were the Plaintiffs and were represented by Attorney Gareth Caldbeck. The original Defendants were the day care corporation and its principal, Lucille Nelson, who operated the home day care, as well as her husband Robert Nelson. The Defendants' insurance company provided a defense through Attorney Kilmartin. Attorney Oreste V. Valsangiacomo, Jr. also represented the Defendants, having been retained by them directly.

The case was filed in September of 1997. From the beginning, Attorneys Caldbeck and Kilmartin were the active advocates and they opposed each other in a highly contentious manner. By July of 1998, over 60 motions had been filed. Many of the motions included highly personal attacks made by one of the two attorneys against the other. The hostile dynamic that developed between them was unnecessary, unprofessional, and distracting. It had a life of its own, separate and apart from the demanding needs of the case, such that each attorney appeared unable to avoid provoking the other gratuitously on a regular basis or to avoid overreacting to the other's

2

provocation. Both attorneys are intelligent and experienced, but it became readily apparent that Attorney Caldbeck was emotionally involved in his clients' case, and Attorney Kilmartin could not resist the temptation to "bait" him and provoke a reaction, which prompted a counterreaction. The intensity of this negative dynamic far exceeded any level of animosity that occasionally develops between attorneys in Vermont. As a result, the case demanded a high level of judicial oversight.

There were many disputes between the parties concerning discovery issues, and concerning requirements of pretrial discovery orders. Motions for Contempt, Motions to Strike, Motions for Protective Orders, and Motions for Sanctions began to be filed not long after the case was filed. On December 11, 1997, Attorney Caldbeck filed a Motion to Compel on the grounds that Attorney Kilmartin was refusing to comply with a detailed discovery order issued by the court. On January 23, 1998, the Motion was granted with compliance required by February 6, 1998. In another ruling the same day, the court admonished Attorney Kilmartin that his opposition was nonresponsive "and appears to be without substantial justifications. [Included] language is unacceptable and if included in future pleadings it may result in sanctions pursuant to VRCP 26 (g)." Entry Order on Motion for Contempt, No.10, January 23, 1998. The court entered a revised, detailed, specific, realistic Pretrial Order on January 23, 1998.

Rather than comply with the Order compelling the production of discovery by February 6th, Attorney Kilmartin filed, late, a Motion for a Protective Order in which he sought permission to decline to provide the requested discovery material. The court denied the motion in a March 2, 1998 Entry Order: "Compliance with the Plaintiff's Motion to Compel was required by February 6, 1998. This Motion was not filed until 10 days after that date and is out of time. In the context of the history and the Orders in this case, it is unreasonable delay. As sanctions pursuant to VRCP 26(g), Atty Kilmartin shall pay Atty Caldbeck $150 in attorneys fees for having to respond to this motion. This Motion is also denied on substantive grounds. Further sanctions may be imposed if the material is not provided within five days." These were discovery sanctions imposed pursuant to V.R.C.P. 26 (g).

Attorney Kilmartin did not comply, but filed another motion on March 13, 1998, seeking again to avoid providing the discovery that was seriously overdue. The court denied the motion in an Order of March 26, 1998, which stated in part:

> Because Attorney Kilmartin has advanced a position without basis as a reason for avoiding providing discovery past due under a prior Order on a Motion to Compel, sanctions are appropriate. Plaintiff's attorney was put in the position of having to respond to this Motion, and Plaintiffs still have not received discovery in compliance with discovery requirements and orders. Plaintiff's ability to obtain discovery in the normal course has been seriously disrupted. Attorney Kilmartin shall pay Plaintiff's attorney $500.00 (4 hours x $125 per hour) as sanctions. In addition, the Court will not consider any further discovery motions

from Attorney Kilmartin until he files an affidavit that he has paid all sanctions ordered by the Court to date, and has acted in good faith to provide all discovery required to date under all prior orders in the case. Failure to abide by this Order could result in further sanctions.

The Order further specified that the sanctions were imposed as discovery sanctions pursuant to V.R.C.P. 26 (g). Thus, as of March 26, 1998, Attorney Kilmartin had been sanctioned twice for violating specific discovery orders. Questions about his good faith compliance with discovery obligations had been raised.

In January of 1998 the court arranged for an Early Neutral Evaluation to be conducted by Attorney Peter Joslin. The case had attracted public attention, and in February of 1998, the parties stipulated to a Protective Order for the confidentiality of discovery materials. Stipulation filed February 6, 1998. They then stipulated to a delay of the early ADR/ENE to permit the completion of limited discovery, and the court approved the limited delay.

On April 28, 1998, Attorney Kilmartin filed a "Motion for Sanctions for Attorney Caldbeck's False Representations to the Court in regard to present state of Discovery" along with several other motions. In the introductory sentence, he accused Attorney Caldbeck of misconduct and false statements, and continued this direct attack for twenty more pages. Orders issued on April 30, 1998 included admonishments as to the behavior of the two attorneys: "The Court expects the attorneys to conduct themselves professionally during depositions, to make no unnecessary comments to witnesses and parties, and to behave formally and with civility." "The attorneys are expected to conduct discovery within that framework [referring to the Pre-Trial Order] efficiently, and professionally." "In filings with the court, the attorneys shall refrain from the use of rhetoric containing personal criticism." Orders of April 30, 1998.

In early May, Attorney Caldbeck filed a Motion to Amend the complaint to add Robert Nelson as a party Defendant on a theory of piercing the corporate veil. Mr. Nelson had previously been dismissed from the case, and this motion was based on new facts developed in discovery. Attorney Caldbeck also obtained an *ex parte* Order of Approval for an attachment based on affidavits claiming an imminent sale of the real estate in which the day care had been located and personal use by Mr. Nelson of a truck owned by the corporation. When it developed that the Nelsons were in Florida and could not be served, and therefore the likelihood of a sale or use of the truck were no longer imminent, a hearing with notice was scheduled. At the hearing on May 13, 1998, Attorney Kilmartin repeatedly attacked Attorney Caldbeck's representations to the court, claiming that Attorney Caldbeck prepared affidavits for affiants to sign that were inaccurate and that he fabricated evidence. He criticized Attorney Caldbeck for having balked at providing transcripts of telephone interviews Attorney Caldbeck had conducted with some witnesses in the case. He argued that Attorney Caldbeck's conduct required his removal from the case. This was the first time he sought to remove Attorney Caldbeck from the case. The court ruled on the substantive motions only.

During the following month, a flurry of motions was filed, including motions for sanctions, for reconsideration, and for a protective order; motions to add other claims and defendants and to compel. Attorney Kilmartin filed a motion to suspend the discovery schedule, which was denied. Mediation was scheduled to take place on June 22, 1998.

On June 18, 1998, Attorney Kilmartin filed a voluminous "Emergency Motion to Disqualify Attorney Caldbeck & To Call Attorney Caldbeck as a Witness & To Suspend all Proceedings Pending Full Hearing on the Motion to Disqualify." The basis advanced for the motion was that Attorney Caldbeck had prepared affidavits for witnesses to sign that contained facts that were inconsistent with those witnesses' subsequent deposition testimony. Defendants' other attorney, Attorney Valsangiacomo, did not join in this motion, or file any parallel motion, or indicate support for it. In his cover letter to the Superior Court Clerk, Attorney Kilmartin requested a ruling on the motion "no later than 10:30 AM Friday, June 19, 1998," which was the following morning. He made further procedural requests related to obtaining an immediate decision. He proceeded as follows:

> **In any event, we request that Judge Teachout immediately suspend** all discovery and the mediation pending further orders and notice. [Bold in original.]
>
> Under the circumstances, mediation must be canceled and all future discovery suspended. . . .
>
> Please bring to Judge Teachout's attention the mandatory withdrawal required by DR2-110(b) of Attorney Caldbeck because it is known and obvious that his continued employment will result in the violation of a Disciplinary Rule.

On June 19, 1998, the court denied the emergency motion in an Entry Order, stating that "the factual discrepancies described in the Motion are not unusual ones to occur in discovery, and the court will not rule on an *ex parte* basis that they constitute a reason to halt a planned discovery process or an early neutral evaluation of the case."[1]

Therefore, as of Friday, June 19th, Attorney Kilmartin's attempt to seek to cancel mediation, suspend discovery, and remove Attorney Caldbeck from the case was denied on the basis that it lacked merit. The parties were scheduled for mediation with Peter Joslin the following Monday morning.

Attorney Peter Joslin conducted the mediation on June 22, 1998, starting at 9:00 a.m. He

---

[1]Technically, the motion was not filed on an *ex parte* basis, as Attorney Kilmartin's cover letter states that copies were faxed, without exhibits, to the other attorneys. Nonetheless he was asking for a ruling on a voluminous motion to be made immediately, before opposing counsel would have seen all the exhibits or had an opportunity to respond. If the court had acted as he requested, it would have effectively granted the motion on an *ex parte* basis.

began by obtaining all parties' agreement that all mediation proceedings were to be confidential. By late in the day, the parties had reached substantial agreement of a settlement, and proceeded to discuss details of written terms. Attorney Caldbeck asked for a condition of settlement that no professional conduct complaints would be filed. After Attorney Joslin spoke to him privately, apparently to remind him that it was improper to do so, he withdrew this request. Nonetheless, he requested a term of settlement that no civil or criminal complaints be pursued against parties and witnesses involved in the case. At that point, approximately 6:30 p.m., Mr. Joslin had to leave. He suggested that standard terms of settlement be used, and the session ended for the day, but mediation was not terminated.[2]

On June 24th, Attorney Caldbeck faxed to Attorney Kilmartin a proposed written settlement agreement. In the fax cover sheet, he stated: "It is my understanding that the Coop [insurance company] is agreeable to all terms of this agreement insofar as their interests may be concerned." The proposed agreement included in paragraphs 5 and 6 that Defendants would not make any claims, complaints or allegations, civil or criminal, against any persons arising out of the suit and would agree "that they have expressly requested that Attorney Kilmartin not do so," and that the Defendants would agree that "they do not authorize, and will not authorize, Attorney Kilmartin" to make any such claims. (Exhibit A.1 attached to Exhibit A from the hearing on September 25, 1998.) Attorney Kilmartin immediately faxed back a letter in response, in which he stated: "Not only have you misrepresented that the Co-op was agreeable to all terms of your Proposed Agreement, I believe that you should carefully review 13 VSA §8 in light of paragraphs 5 and 6." Attorney Kilmartin thereby raised the claim that Attorney Caldbeck's conduct may be in violation of a criminal statute.

Attorney Kilmartin's position is that on June 24th, when he received the fax cover sheet and proposed settlement agreement from Attorney Caldbeck and saw that Attorney Caldbeck had included paragraphs 5 and 6 in the proposed settlement agreement, a duty on his part to report professional misconduct was triggered under then applicable DR 1-103(A), which required attorneys to report misconduct by other attorneys unless the information is privileged.[3] The

---

[2]See Letter of Attorney Kilmartin dated June 24, 1998 to Attorney Caldbeck (attached as Exhibit B to Plaintiff's Exhibit A from the hearing on September 25, 2002): "You have no basis for. . . More importantly, you are breaching the terms of the mediation and I suggest that you forward this immediately to Attorney Joslin. We will not consider this apart from mediation, which has not concluded." Also see Attorney Joslin's letter of July 17, 1998 regarding his continued involvement.

[3]The confidentiality agreement was to protect settlement discussions, and would not have precluded the filing of professional misconduct complaints. As noted by the Supreme Court in its Memorandum Decision, information that may be confidential under a confidentiality requirement related to mediation, and may thereby also be inadmissible, is nonetheless not privileged, and may be disclosed in other settings, such as in relation to a professional misconduct complaint. Such complaints are, however, confidential under separate Board rules

6

misconduct alleged by Attorney Kilmartin was that in demanding that neither Defendants nor Attorney Kilmartin pursue any criminal or civil complaint against any party, Attorney Caldbeck was violating the following provisions of DR 1-102(A): "A lawyer shall not: . . . (3)Engage in illegal conduct involving moral turpitude; (4) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (5)Engage in conduct that is prejudicial to the administration of justice."   The criminal statutes Attorney Kilmartin references are 13 V.S.A. §7,  §8, and §9.

13 V.S.A. §7, "Inciting to Felony," provides: "A person who endeavors to incite, procure or hire another person to commit a felony, though a felony is not actually committed as a result of such inciting, hiring or procuring, shall be imprisoned not more than five years or fined not more than $500.00 or both."

13 V.S.A. §8, "Compounding Felony," provides: "A person having knowledge of the commission of a felony who takes money, or a gratuity or reward, or an engagement therefor, upon an agreement or understanding, expressed or implied, to compound or conceal such felony or not to prosecute therefor, or not to give evidence thereof, shall be imprisoned not more than ten years or fined not more than $1,000.00 or both."

13 V.S.A. §9, "Attempts," provides in paragraph (a): A person who attempts to commit an offense and does an act toward the commission thereof, but by reason of being interrupted or prevented fails in the execution of the same, shall be punished as herein provided unless other express provision is made by law for the punishment of the attempt."

Attorney Kilmartin alleges that the basis for concluding that Attorney Caldbeck had violated DR 1-102(A) was Attorney Caldbeck's inclusion in the proposed settlement agreement of paragraphs 5 and 6.[4]  Thus, Attorney Kilmartin asserts that as of June 24, 1998, he had a mandatory obligation to report professional misconduct.   DR 1-103(A), then in effect, provided: "A lawyer possessing unprivileged knowledge of a violation of DR 1-102 shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation." Attorney Kilmartin testified on September 25, 2002 that he read the Rule to impose on him not

until the Board decides that the filing of a formal charge is warranted.  This was also the case in 1998.

[4]As to the claim of illegal conduct, the exact nature of the alleged crimes is not readily apparent from the facts, the terms of the proposed settlement agreement, and the texts of the criminal statutes, although Attorney Kilmartin purports to explain it in his July 2nd motion.  The claims of misrepresentation apparently relate to the statement that the Coop Insurance Company was in agreement with all proposed terms, including paragraphs 5 and 6.  The claim of conduct prejudicial to the administration of justice is apparently the inclusion of paragraphs 5 and 6 calling for Defendants and Attorney Kilmartin not to pursue criminal or other complaints, which could possibly be interpreted to include disciplinary complaints.  Attorney Kilmartin has also claimed that Attorney Caldbeck appeared to be counseling his clients to engage in an act that violated the criminal law.

7

only an obligation to report a violation on the part of Attorney Caldbeck, but to do so to "this" tribunal, i.e., the Superior Court.

He also testified, and the court so finds, that his reaction to paragraphs 5 and 6 included a concern that Attorney Caldbeck was attempting to drive a wedge between Attorney Kilmartin and the Defendants, his clients. The court finds that some of the terms in paragraphs 5 and 6 functioned, among other things, as yet one more in a long series of provocations, and prompted a zealous response on the part of Attorney Kilmartin.

The foregoing provides the context for the conduct that is the subject of the sanctions in the present proceeding. To summarize, as of June 24th, the case had substantially settled but the terms of a written stipulation had not been finalized, and Attorney Joslin remained involved to help complete the settlement. Attorney Caldbeck was seeking to include in the settlement agreement a covenant for no civil or criminal claims to be pursued by either the Defendants or Attorney Kilmartin, and Attorney Kilmartin felt that such conduct on the part of Attorney Caldbeck was professional misconduct which he, Attorney Kilmartin, was obligated to report.

The court accepts at face value Attorney Kilmartin's conclusion that he had a professional obligation to report what he perceived to be professional misconduct, and does not base its finding of bad faith on any analysis of the merits of such a conclusion. Although the claim that Attorney Caldbeck was engaged in the commission of a crime is not one that presents itself with self-evident clarity, and Attorney Caldbeck had already withdrawn any effort to negotiate away disciplinary complaints, there is no question that Attorney Caldbeck was attempting to prevent the pursuit of criminal claims. Such an effort raises issues with public policy implications and has been the basis of attorney discipline, including suspension from law practice for six months. *In the Matter of David Friedland, et al*, 59 N.J. 209 (1971) (attorneys suspended for six months for arranging settlement of civil claims on terms that included dismissing pending criminal complaints). This is a plausible basis upon which Attorney Kilmartin could have concluded that he had a professional obligation to report perceived attorney misconduct, even though there is no evidence that either of the other two attorneys aware of this conduct (Attorneys Valsangiacomo and Joslin) reached such a conclusion.

Assuming Attorney Kilmartin believed that there was a basis for a duty to report, DR 1-103 provided that the attorney shall "report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation." At the time, the Professional Conduct Board was the tribunal empowered to investigate and act upon reports of alleged misconduct.[5]

---

[5]Effective September 1, 1999, the Rules of Professional Conduct replaced the Code of Professional Responsibility, and the Professional Responsibility Board replaced the Professional Conduct Board. The Professional Conduct Board had staff, resources, and procedures to review reports, undertake investigations, conduct hearings, and recommend sanctions to the Supreme Court. The Superior Court did not have concurrent jurisdiction, and did not have staff, resources, or procedures.

8

To the extent alleged misconduct threatened to compromise the fairness of a pending case, a motion to disqualify an attorney could be filed in the case. There is not necessarily any direct connection between violations of the Code of Professional Conduct and litigation of the case. See *In re Gadbois*, 12 Vt.L.W. 275 (2001) (attorney disqualified, but no finding of violation of the Code); *State v. Zele*, 168 Vt. 154, 161 n.2 (1998) (alleged violations of the Code have no direct bearing on the fairness of trial and were rejected as basis for arguments for reversal in criminal appeal).

Violations of the Code may or may not directly affect the fairness of the proceeding and involve conduct that supports a motion to disqualify opposing counsel. The commentary to Rule 1.7 of the Model Rules of Professional Conduct currently in effect states that where a conflict of interest between an attorney and a client "is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question. Such an objection should be viewed with caution, however, for it can be misused as a technique of harassment." This shows that a motion to disqualify should only be filed by opposing counsel when the fair administration of justice is threatened. This is not necessarily every situation in which there are grounds for discipline of opposing counsel.

Complaints filed with the Professional Conduct Board remained confidential throughout an investigatory stage, and only became public upon the filing of a formal charge. A.O. 9, Rule 12. Motions filed with the Superior Court in a civil case are public documents.

Thus, Attorney Kilmartin's perceived mandatory obligation to report called for him to file a report with the Professional Conduct Board. If he also concluded that Attorney Caldbeck's conduct compromised the integrity of the mediation or other legal process in the case, he could also file a motion to disqualify Attorney Caldbeck in the lawsuit. In filing such a motion, it would not have been necessary to include specific information from the mediation session upon the initial filing of the motion. He could have described the allegations in general terms to avoid compromising the confidentiality of the ongoing mediation process, or asked for an evidentiary hearing on the motion with the hearing closed to the public due to the confidential nature of the proposed evidence because of the continuation of mediation, or he could have sought permission to file confidential information under seal.[6]

As an experienced attorney, he knew that these were the options for filing confidential information with the court, since all documents filed with the court are subject to public inspection. Sensitivity to maintaining the confidentiality of mediation discussions was particularly important in this case at that time because settlement efforts were active, and the press was following the case. Any information that became part of the case record was likely to be published and jeopardize the ability to conclude the settlement of the case.

---

[6]These are methods routinely used when motions are filed on discovery issues involving discovery materials that are subject to a confidentiality agreement or protective order.

9

It is also inherent in the filing of motions in Superior Court that they are required to be served on other counsel of record at the time of filing, except in the case of specified *ex parte* motions in which specific standards must be met for particular purposes.[7] Thus, the filing of a motion to disqualify Attorney Caldbeck would have required service on Attorneys Caldbeck and Valsangiacomo.

In any event, in addition to filing a motion to disqualify Attorney Caldbeck in the case, or in lieu thereof, Attorney Kilmartin's obligation was to file his report of perceived attorney misconduct with the Professional Conduct Board. It was the only tribunal equipped to investigate reports of attorney misconduct and to discipline attorneys. The filing of any motion to disqualify based on attorney misconduct would be in addition to, and not instead of, a report to the Professional Conduct Board.

Having set out the framework of courses open to Attorney Kilmartin, let us turn to the actions undertaken by him.

On June 29, Attorney Kilmartin filed with the court a cover letter and eight page document entitled "Confidential Disclosure Under DR 1-103(A)." The cover letter to the Clerk was also marked "Confidential" and stated: "Would you please immediately bring my mandatory Disclosure to Judge Teachout's attention. I have marked it confidential. If the Court wishes me to serve this Disclosure on other parties, I will do so upon specific instructions from the Court." (Exhibit A, hearing of September 25, 2002.)

This filing, entitled "Disclosure," was neither a motion seeking *ex parte* relief under any rule of the Vermont Rules of Civil Procedure, nor a report filed with the Professional Conduct Board. It was an *ex parte* communication with the presiding judge concerning a case, and as such an impermissible communication.[8] The court, having read only the cover letter and title page, wrote on it on June 30th: "I will not participate in ex parte communications concerning the case," and instructed the clerk to return it to Attorney Kilmartin, which was done.

The argument that Attorney Kilmartin believed this to be the appropriate mechanism for discharging an obligation to make a mandatory report of attorney misconduct for the purposes of attorney discipline has been advanced only in general terms, has not been supported by any specific evidence concerning steps taken by Attorney Kilmartin, and does not have a plausible

---

[7]See, e.g., V.R.C.P. 4.1 (b)(3) concerning motions for an *ex parte* attachment, and V.R.C.P. 65 (a) concerning motions for an *ex parte* temporary restraining order.

[8]Canon 3 B (7) of the Code of Judicial Conduct provides: "A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except..." as specified in five clearly stated exceptions, none of which involve attorney discipline.

basis. Attorneys know that mandatory reports are filed with the Professional Conduct Board and not with the Superior Court, and that it is not the role of the Superior Court Judge to administer the process by which professional conduct complaints are handled. This is not, however, the conduct for which Attorney Kilmartin was sanctioned. Nor was there any harm done, as the court returned it without reading it, and since it was not filed, it was not part of the case record.

To follow through on his mandatory obligation to report misconduct, Attorney Kilmartin had only to file the document with the Professional Conduct Board. There is no evidence that this was ever done at any time, either before or after the case was settled.[9] This fact alone raises questions about Attorney Kilmartin's motive with respect to subsequent actions.

Two days later, on July 2, 1998, Attorney Kilmartin filed with the court a complicated motion entitled "Motion for Permission to Appeal Order of June 19, 1998 [the denial of the emergency motion to disqualify Attorney Caldbeck,] or in the Alternative to Suspend and Disqualify Attorney Caldbeck." In this motion he accused Attorney Caldbeck of misconduct in proposing paragraphs 5 and 6 and in conduct at the mediation session, and he repeated the prior charge that Attorney Caldbeck had prepared false affidavits. Attorney Kilmartin described specific discussions that took place at the mediation session on June 22nd, and he attached as an exhibit a draft settlement agreement that Attorney Caldbeck had faxed to him. This was a regular motion, with no request for any portion of it, including the attachments, to be sealed. Thus, it immediately became a matter of public record, even though the settlement process under the supervision of Attorney Joslin was still ongoing.

This motion filed on July 2nd was the first of three such events for which Attorney Kilmartin received the sanction on September 2, 1998.[10] The others were motions filed on July 9th and July 10th in which Attorney Kilmartin included pages of descriptions of the substance of the discussions at the mediation session that took place on June 22nd. In the July 9th motion he included an affidavit from Lucille Nelson, a participant at the June 22nd session. The sanctions were not imposed for having filed any motion, including any motion to disqualify, but for having

_____

[9]The Professional Conduct Board was required to maintain confidentiality about complaints it received until a formal complaint was filed. The complainant was not bound by such confidentiality. In this case, Attorney Kilmartin made public, in his subsequent July 2nd motion to this court, that he was alleging professional misconduct, so it is not logical to conclude that he filed a report with the Professional Conduct Board but believes he cannot reveal having made such a complaint. This court, having raised the issue in the prehearing Entry Order clarifying the purpose of the hearing and having heard no evidence on the matter, is left to infer that he did not file such a report.

[10]Attorney Caldbeck received a similar sanction for the same reason but in a lesser amount based on proportionality of responsibility for the costs imposed on public resources. Attorney Caldbeck did not appeal, and thus the account of the case does not focus on his conduct.

included in and with it confidential information from the mediation and settlement process that thereby became part of the public record of the case.

At the time that each of the three motions was filed, the mediation followup process to finalize the settlement was ongoing. Attorney Joslin remained involved to facilitate settlement. (Letter of Attorney Joslin filed on July 17, 1998.) A settlement was reached by July 20th. (Transcript, Motions Hearing Excerpt, July 20, 1998.) It is noted that if the court had granted the July 2nd motion on either of the alternative grounds alleged, the effect would have been to suspend the case for several weeks for further court proceedings, resulting in delay in reaching a resolution. By this time, it had become clear that the Coop Insurance Company would incur financial obligations, presumably in the near future, if the case settled. Delay would have disadvantaged the Plaintiffs by postponing their receipt of damages; it would have benefitted the insurance company that retained Attorney Kilmartin by postponing payment of damages. It would have frustrated Attorney Caldbeck's efforts to achieve a prompt resolution of the case on behalf of his clients.

Attorney Kilmartin did not seek permission to appeal the denial of his June 18th Motion to Disqualify Attorney Caldbeck (based on a claim of preparation of false affidavits) during the two weeks between June 19th and July 2nd. If he believed that such conduct and Attorney Caldbeck's representation of Plaintiffs prejudiced the integrity of the ongoing process on those grounds, then it would have been logical to seek interlocutory appeal immediately after the motion was denied on June 19th. The alternative motion, that Attorney Caldbeck committed professional misconduct during the mediation session, makes more sense as the basis for a motion filed on July 2nd, but even so, one has to wonder why such a motion was appropriate at that time. Even if Attorney Caldbeck was making an unreasonable demand as to settlement terms, Attorney Joslin had been successful in dissuading Attorney Caldbeck from overreaching before, and could be called upon again if needed. It does not appear that Attorney Kilmartin sought input from either Attorney Joslin (the mediator) or Attorney Valsangiacomo (Defendants' other counsel) on this issue before filing the motion to disqualify. On the contrary, Attorney Kilmartin's letter of June 24th shows how quickly he responded to the written settlement proposal with an allegation of professional misconduct.

The fact that Attorney Kilmartin waited until July 2nd to seek interlocutory appeal on the first issue (inaccurate affidavits) raises a question about his purpose. The fact that he sought disqualification on the second issue (misconduct during the mediation session) without invoking the assistance of Attorney Joslin and without the support of Defendants' other counsel also raises a question about his purpose. Finally, the fact that he blended the requests on the two issues into a complex web in a double motion that takes time and attention to unravel raises an additional question about his reason for filing the motion at all, and doing so when he did. Both motions were denied in an Entry Order of July 9th.[11]

---

[11]The docket entries show that on July 10th, the Clerk received notice from the Supreme Court of an interlocutory appeal. By Entry Order of August 31, 1998, the Supreme Court denied

12

On July 6th, Attorney Caldbeck responded to Attorney Kilmartin's July 2nd Motion by faxing to the court an "Initial Reply," in which he also described specific conversations from the mediation session, and requested that the court seal Attorney Kilmartin's motion. As described by the Supreme Court, "[t]hus began an exchange of several filings between the parties that disclosed more information pertaining to the confidential mediation. The court ordered the temporary seal of certain pages of these documents on three separate occasions, making clear that its reason for doing so was to protect the confidentiality of the parties' mediation and settlement discussions." *Lawson* at 575. The court scheduled a hearing on Attorney Caldbeck's Request to Seal to take place on July 20th. At the hearing, the attorneys notified the court that the case had settled, and that documentation would subsequently be completed and filed with the court. Thus, the court continued the hearing on the Request to Seal until after the settlement process was complete, and asked the attorneys to submit legal memoranda on the issue of sealing documents.

The court issued a Decision on August 21st on the Request to Seal, releasing the temporary seal on all documents except for the portion of the draft settlement proposal that contained proposed financial terms of settlement.[12] In the Decision, the court identified the attorneys' filing of confidential mediation material as potentially having been done in violation of the confidentiality agreement related to mediation, and gave notice to Attorneys Caldbeck and Kilmartin of the possibility of imposition for sanctions. A hearing was scheduled, which took place on September 2, 1998.

As described above, the court imposed sanctions at the conclusion of the hearing for having filed confidential material, allocating between the two attorneys the compensatory costs to the court of having had to use significant operational resources to respond.[13] The allocation was based on specified costs and facts. Transcript, pp. 32-33. Attorney Kilmartin's share was $2,000.00, and Attorney Caldbeck's share was $1,000.00. Attorney Kilmartin appealed, resulting in the decision referenced above and the remand for the court to make a finding concerning whether the conduct was done in bad faith. Attorney Caldbeck did not appeal.

The specific conduct for which Attorney Kilmartin was sanctioned was repeatedly filing with the court documents containing information protected by the confidentiality of the mediation process. In explaining the compensatory basis for the amount of the sanction, the

---

"Defendants' motion for permission to appeal," although it is not stated which interlocutory order was the basis for the Defendants' appeal to the Supreme Court.

[12]This remained sealed in order to permanently protect the terms of the final confidential stipulation.

[13]The court addressed the impact of the conduct and concluded that the detriment fell on the public through consumption of court resources rather than on the parties. It calculated that five days of judge and staff time was spent in handling the consequences of such conduct, and used the daily cost of operation as the basis for the sanction: 5 days x $600 = $3,000 total cost.

court noted that Attorney Kilmartin filed 42 pages of confidential material that had to be temporarily sealed, consisting of 31 pages when duplicate fax copies are disregarded. Attorney Kilmartin filed a copy of a proposed settlement agreement during the course of an ongoing mediation and settlement process, as well as an affidavit by an individual present at the June 22nd mediation session describing the content of discussions during the session. Attorney Kilmartin filed the first motion containing confidential material. Not only did he initiate the exchange of such filings but he continued it, filing such material on three separate occasions, including after the court issued entry orders temporarily sealing such material.

Attorney Kilmartin claims that he filed such material for two purposes: to disclose unethical conduct and/or potentially criminal conduct, and to disqualify Attorney Caldbeck.

If his purpose was to disclose unethical conduct, the filing of confidential material with the Superior Court from the mediation session three times between July 2nd and July 10th in the context of the filing of civil motions was not the way to do it. As previously noted, after the court made clear on June 30, 1998 that it would not assume responsibility for administering a professional conduct complaint separate and apart from a motion filed with the court, Attorney Kilmartin's recourse was to make his mandated report by filing a complaint with the Professional Conduct Board. There was no need to file confidential material in the Superior Court in connection with unethical conduct. The reasonable course of action was to file a complaint with the Professional Conduct Board. There is no evidence that this was ever done.

Similarly, if his purpose was to disclose potentially criminal conduct, the filing of the confidential material in motions in the Superior Court was ineffectual. The reasonable course of action was to contact law enforcement personnel and/or the State's Attorneys office to facilitate a review of the possibility of criminal charges. There is no evidence that this was ever done. Thus, Attorney Kilmartin's rationale for the conduct does not match the conduct in which he actually engaged. As an experienced attorney, he would have known how to achieve the objectives he claims he was pursuing. Those objectives are not consistent with his conduct, and raise serious questions about his motivation.

The second purpose on which Attorney Kilmartin relies is that he was seeking to disqualify the opposing lawyer, Mr. Caldbeck, presumably on the basis of unethical conduct affecting the administration of justice in the case. That purpose does not, however, explain why it was necessary for him to put into the public record material that was confidential mediation information when reasonable alternatives existed: requesting in advance, or at least contemporaneously, to have confidential evidentiary material sealed by the court, or describing in general terms without specifying it that misconduct occurred and seeking a closed evidentiary hearing. The purpose does not justify the filing of confidential material not only once but repeatedly, including after the court had ordered that it would temporarily seal such material. Again, the rationale does not match the conduct in which he actually engaged.

This analysis shows that Attorney Kilmartin's claimed purposes, however valid they may appear on their face, do not justify the actions he took. In addition, the history of the case shows

14

that there was a high degree of animosity between the attorneys; that Attorney Kilmartin had engaged in a pattern over several months of "baiting" Attorney Caldbeck; that Attorney Kilmartin had been sanctioned twice for discovery violations that involved willful and knowing refusals to comply with discovery requirements to provide information to Attorney Caldbeck; that Attorney Kilmartin had already tried unsuccessfully to have Attorney Caldbeck disqualified from the case twice (orally in court on May 13th and by motion on June 18th); that this conduct occurred in the context of a third attempt; that Attorney Kilmartin acted swiftly to seek to disqualify Attorney Caldbeck again without the support of the other attorneys at a time when the case was already substantially settled; and that disqualification of Attorney Caldbeck would have deprived Plaintiffs of the one attorney familiar with their case at a time when they were near settlement, and foiled Attorney Caldbeck's attempt to settle the claim in a timely manner. Most importantly, none of Attorney Kilmartin's stated purposes are advanced by the public filing of confidential material from the mediation process.

Finally, the record includes a letter to the Clerk dated August 3, 1998 from Attorney Valsangiacomo stating as follows:

> I am extremely concerned that Mr. Kilmartin has continued to file pleadings on behalf of the Defendants. Enclosed for filing is a letter from the insurance company in connection with this matter authorizing me to sign the Stipulation for Dismissal without the necessity of securing Mr. Kilmartin's signature.
>
> This letter supports my representations to the Court that Mr. Kilmartin's authority is limited.
>
> If any further pleadings are filed without my co-signature, I would request that an immediate hearing be held before the Court in order to clarify this situation.
>
> Otherwise, let's hope that eventually reason will prevail, and this matter will finally be resolved without any further difficulties.

This letter reflects a concern on the part of both the insurance company and Defendants' other counsel that some of Mr. Kilmartin's actions in the case were motivated by reasons beyond the goals and desires of either the Defendants themselves or their insurer, and that such conduct was not perceived by them to be in their interest. This matches the court's observation of the manner in which the case was being conducted in June and July of 1998.

*The standard for "bad faith"*

This case involves the imposition by the court of a sanction against an attorney for actions taken during his conduct of a case. The court's power to sanction in such a situation

15

derives either from Rule 11,[14] or from the inherent authority of the court. *Van Eps v. Johnston*, 150 Vt. 324 (1988), *United States v. Seltzer*, 227 F.3d 36 (2d Cir. 2000), *Eash v. Riggins Trucking, Inc.*, 757 F. 2d 557 (3d Cir. 1985). In this case, the trial court relied on the inherent authority of the court (Decision and Order, August 21, 1998, page 9), and the Supreme Court analyzed the case within that framework.[15] Where Rule 11 is relied upon, attorney conduct in filing documents with the court is sanctionable if done "for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." V.R.C.P. 11 (b)(1). In this case, the Vermont Supreme Court has determined that the trial court must make a finding of "bad faith."[16] *Lawson* at 574.

The first question is what is the meaning of "bad faith" in the attorney discipline context. The second is whether the conduct in this case falls within that meaning and the policy objectives of the standard.

Cases from the different courts that have addressed bad faith in the context of sanctions for attorney conduct based on the court's inherent authority show that no uniform body of law has developed, even in the cases reported since September of 1998 when the sanction was imposed. Courts are seeking to define when a finding of bad faith is a prerequisite for sanctions,

---

[14]V.R.C.P. 11 (b): "**Representations to Court**. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . ."

[15]Rule 11 permits a court to impose monetary sanctions on the court's initiative when the court issues its show cause order before the claims against the party whose attorney is sanctioned are dismissed. In this case, the stipulation for dismissal was filed on August 10, 1998, and the court's show cause order was issued on August 21, 1998 in conjunction with the court's order on the Plaintiff's outstanding Request to Seal. It is arguable that Rule 11 was nonetheless applicable because the show cause order was issued in relation to a collateral matter that was still pending against Defendants (Plaintiffs' Request to Seal) even after the substantive case against the Defendants was dismissed. The court observed all notice and hearing requirements applicable under Rule 11, and the sanction imposed was within the limits set forth in Rule 11 (c)(2).

[16]The Vermont Supreme Court also used the phrase "improper purpose" in certain places in the opinion. As noted above, Rule 11 possibly could have been the basis for a sanctions hearing. The relationship between the "improper purpose" and "bad faith" standards is discussed more fully below. This court agrees with Attorney Bent's argument that in spite of occasional references to "improper purpose," the holding of the Court is that the sanction imposed by the trial court cannot stand unless the court makes a finding of "bad faith" upon remand.

what standard of proof must be met, and whether the standard is met in specific cases.[17]  Bad faith is not always a required standard, but procedural due process is a prerequisite, and the factual basis for a sanction must be clear.

For example, in *United States v. Seltzer*, 227 F. 3d 36 (2d Circ. 2000), Judge Parker noted that where the charges involve a lawyer's negligent or reckless failure to perform his or her responsibility as an officer of the court, as opposed to actions undertaken for the client's benefit, "sanctions may be justified absent a finding of bad faith given the court's inherent power to 'manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.* at 41 (internal citation omitted).  Subsequently, the Second Circuit has held that [a]n award of sanctions under the court's inherent power must be based on 'clear evidence' and must be accompanied by 'a high degree of specificity in the factual findings.'" *Mickle v. Morin*, 297 F. 3d 114, 125-126 (2d Cir.2002)(citing *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986), and also *Seltzer*, 227 F. 3d at 43).

Many instances of attorney sanctions occur in the context of complaints under Rule 11, rather than in reliance on the court's inherent authority, and are thus analyzed under an "improper purpose" standard.  Although case law supports a trial court's power to sanction when an attorney has acted in bad faith, it is difficult to find cases in which courts have examined the content or elements of "bad faith."  Examples of cases applying the "bad faith" standard include *Van Eps v. Johnston,* 150 Vt. 324, 326-27 (1988)(inherent power to assess sanctions for consequential impact, such as attorney's fees, for acting in bad faith); *Agency of Natural Resources v. Lyndonville Savings Bank & Trust Co.,* 13 Vt.L.W. 215, 216 (2002)(inherent power to award attorney's fees in exceptional cases based on bad faith conduct of litigants); *In re Sherman Hollow, Inc.*, 160 Vt. 627, 630 (1993)(request for sanctions denied absent evidence of bad faith); *Eberly v. Eberly,* 489 A. 2d 433, 449 (Del.1985)(inherent power to assess attorney's fees against counsel when that lawyer has acted in bad faith or wilfully abused the judicial process); *Charles v. Charles*, 505 A. 2d 462 (D.C. App.1986)(court may invoke inherent powers and assess attorney's fees, but only upon specific finding of bad faith); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980)(federal courts have inherent power to levy sanctions in response to abusive litigation practices where there is a finding of bad faith).

The "bad faith" standard is comparatively more stringent than the Rule 11 standard. "Rule 11, for example, imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991).

---

[17]In addition, there are procedural requirements of notice and an opportunity to be heard prior to the imposition of sanctions.  *Van Eps v. Johnston*, 150 Vt. 324 (1988).  For a thorough analysis of inherent judicial authority as the basis for monetary sanctions against an attorney, see *Eash v. Riggins Trucking, Inc.*, 757 F. 2d 557 (3d Cir. 1985).  The court noted: "The dramatic rise in litigation in the last decade has led trial judges to conclude that indulgent toleration of lawyers' misconduct is simply a luxury the federal court system no longer can afford." *Eash* at 565.

"Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Express*, 447 U.S. at 764. In the absence of rulemaking, there are no clear procedural rules or substantive standards. "A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Chambers* at 50(citing *Roadway Express* at 767). Thus, to guard against the abuse of judicial power, courts have developed procedural requirements and require specific findings and a high evidentiary standard. *Mickle*, 297 F.3d at 125-26 (citing *Oliveri*, 803 F.2d at 1272). Nonetheless, the elements of "bad faith" for purposes of an inherent authority analysis are not clearly developed in the case law, as courts often remand for a determination of bad faith, or reach a conclusion that the conduct at issue falls short of bad faith, without necessarily specifying the elements of bad faith. See *Mickle*, 297 F. 3d at 126; *Seltzer*, 227 F.3d at 42-43; *Mackler Production, Inc. v. Cohen*, 146 F.3d 126, 130-31 (2d Cir. 1998); *Roadway Express,* 447 U.S. at 767; *Charles*, 505 A.2d at 467; *Van Eps,* 150 Vt. at 329.

Judicial gloss on a specific statute may also complicate the effort to distinguish "bad faith" from "improper purpose," as shown by the following excerpt from a passage in which the California Appeals Court construed "bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay" under a statute authorizing sanctions: "There must also be a showing of an improper purpose, i.e. subjective bad faith on the part of the attorney or party to be sanctioned." *Levy v. Blum*, 92 Cal. App. 4th 625, 635, 112 Cal.Rptr.2d 144, 152, 2001 WL 1133475 at 6 (Cal.App. 2001)(citations omitted).

*Black's Law Dictionary* (6th ed. 1990) defines "bad faith" as follows:

> **Bad faith.** The opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. The term "bad faith" is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will. Stath v. Williams, Ind. App., 367 N.E.2d 1120, 1124.

This definition makes clear that acting from an improper purpose is only one element of "bad faith," which calls for a finding of additional elements such as violating a duty, acting consciously, and acting with questionable moral integrity. For example, an attorney could act from an improper purpose (showing off, for example) without doing so to such a degree that the "bad faith" standard is met.

The attempt to define "bad faith" as a basis for attorney sanctions calls for a clear identification of the policy purposes for having such a standard for the sanctioning of attorney conduct where sanctions are based on the inherent authority of the court. As described in depth

by the Third Circuit Court of Appeals in *Eash v. Riggins Trucking, Inc.,* 757 F.2d 557 (3d Cir. 1985), a "court's inherent authority to manage its caseload, control its docket, and regulate the conduct of attorneys before it, provides authority to fashion tools that aid the court in getting on with the business of deciding cases." *Id.* at 567. While Rule 11 provides a foundation for sanctions in the situations to which it applies, there are circumstances not covered by Rule 11, and inherent authority provides a basis for the exercise of comparable authority to further the core functions of the court. *Id.* at 562-63.

Where there are specific rules, such as Rule 11 and Rule 26 (g) (specifically governing discovery sanctions), the rules themselves generally specify the attorneys' obligations, the standards that will be applied, and the type of sanction to be expected. Where there are no specifically applicable rules, standards are needed to provide a restraint on the abuse of judicial power. These include due process requirements of advance notice of improper conduct, notice to the attorney and an opportunity to be heard before sanctions are imposed, a high level of specificity in the factual findings, and a clear evidentiary basis for the sanction. See *Mickle*, 297 F.3d at 125-26, *Seltzer*, 227 F.3d at 43. Without these protections, the court's "inherent authority" could itself be misused in a manner unfair to attorneys, or for reasons other than the functional necessity upon which it is founded. *Eash*, 757 F. 2d at 562-63.

In this case, the Court has remanded the case for the trial court to clarify the factual basis for its conclusion that he acted from an improper purpose, and to address his claim that he acted from a proper purpose. The Court was also concerned that Attorney Kilmartin did not have clear notice that filing confidential mediation material was sanctionable, but noted that attorneys did have notice from the *Van Eps* case "that negotiating in bad faith during settlement negotiations can result in sanctions." *Lawson* at 578. Therefore, although there may have been a lack of clarity in 1998 about a court requirement prohibiting filing confidential mediation material,[18] attorneys were on notice that negotiating in bad faith was sanctionable. Thus, although

---

[18]In 1998 there was no clear rule on confidentiality of mediation communications. Since 1998, the situation has changed. V.R.C.P. 16.3 on Alternative Dispute Resolution, adopted October 5, 1999 and effective December 31, 1999, has a specific subsection entitled "Confidentiality" which provides that "all written or oral communications made in connection with or during an alternative dispute resolution proceeding conducted under this rule...are confidential..." V.R.C.P. 16.3 (g). The Reporter's Notes to paragraph (g) state: "The purpose of the confidentiality requirement is to encourage ADR participants to speak candidly in order to facilitate the conduct of processes such as preliminary evaluation and mediation. The requirement of confidentiality is binding on all parties by virtue either of their express ADR agreement under Rule 16.3 (c) or their implied agreement to engage in preliminary evaluation under Rule 16.3(d)." Reporter's Notes to V.R.C.P. 16.3 (g), page 136. In V.R.C.P. 16.3 (h), courts may impose sanctions for noncompliance "unless that person shows good cause for not...complying," and sanctions may include specified actions or "any other sanction that is just and appropriate in the circumstances." V.R.C.P. 16.3 (h). The Reporter's Notes provide that "Rule 16.3 (h) is intended to supplement, rather than supersede, Rule 11."

19

"improper purpose" alone would be the standard under a Rule 11 analysis, the Court has ruled that this case calls for the more stringent "bad faith" standard from *Van Eps*.[19]

It appears that interpreting the meaning of "bad faith" for purposes of sanctions for attorney conduct based on the court's inherent authority is a matter of first impression in Vermont. Based on the specific findings of fact set forth above, the court's review of case law from Vermont and other jurisdictions, and the policy of allowing courts to regulate attorney conduct as needed for the orderly administration of justice but only with fairness and restraint, the court concludes that five elements are present in this case which, collectively, compel the conclusion that the conduct in this case constitutes bad faith. Those elements are (1) the conduct was in violation of a duty to the court; (2) the conduct was not the result of an inadvertent mistake but consisted of conscious acts; (3) the proferred justification, though it appears valid on its face, is not supported by the actual conduct; (4) the conduct was prompted by an improper purpose; and (5) it involved ill will.

The first element is violation of a duty to the court. This court previously identified the violation as filing confidential information from mediation in the public record of the case. (Transcript, Sanctions Hearing, September 2, 1998, pp. 27-28.) The Supreme Court has ruled that the sanction could be based on violation of the obligation to negotiate in good faith during settlement negotiations if bad faith is shown. The facts show that from July 2nd to July 10th, during which the three public filings of confidential mediation information took place, the parties were engaged in serious settlement negotiations. The facts are clear that substantial agreement had been reached on June 22nd, and the effort to settle the specific terms of a written agreement remained ongoing and active until the case actually settled on July 20th. The parties had made a specific agreement to confidentiality on June 22nd, at the beginning of the process, and a confidentiality agreement was in place with respect to discovery in the case. The press was following the case. The material Attorney Kilmartin filed included not only an affidavit account of who said what to whom at the mediation session, but it included a physical copy of a draft settlement agreement circulated as a proposed final agreement. Under these circumstances, placing confidential settlement discussions and proposals into the public record, in violation of the specific agreement not to do so, and under circumstances where it would be sure to be publicized while the case was in active settlement negotiations, violates the duty to negotiate in

---

[19]As noted in the previous footnote, the standard that would be applied now to a filing of confidential mediation communications is whether the person "shows good cause for not...complying." V.R.C.P. 16.3 (h). Imposition of sanctions would occur under Rule 16.3, rather than on the court's inherent authority. The scope of permissible sanctions would include compensatory sanctions. Attorney Bent has argued that his client should not be sanctioned for the purpose of educating the bar. The Supreme Court's decision is consistent with this position, as it permits the sanction only for a violation of an obligation about which attorneys were already on notice (the obligation to refrain from negotiating in bad faith), and it imposes the higher "bad faith" standard rather than the lower standards of "improper purpose" from Rule 11, or 'no good cause for not complying' from Rule 16.3.

20

good faith. *Lawson* at 578.[20]

The second element is that the conduct was not inadvertent but conscious. Attorney Kilmartin chose to include in motions that were a matter of public record confidential communications that, if made public, would jeopardize the finalization of the settlement. He did so despite his own agreement to confidentiality of discovery, the agreement he and all participants at the mediation session made to the confidentiality of mediation discussions, and his own knowledge that the settlement process continued after June 22nd, with the continued available assistance of Attorney Joslin. Attorney Kilmartin's deliberate choice to file in a public manner is revealed by the fact that once his "Disclosure" was returned as an *ex parte* communication, he chose to file a motion in the civil case, including the confidential material, without any attempt to protect the confidential communications or seek a protective order from the court. It is fundamental that the public has access to documents filed with the court without a specific order establishing otherwise. In addition, he repeated the filing of confidential mediation communications even after the court's response to the first such event was to temporarily seal the confidential portions of the motion. It is clear that his conduct was not the result of an inadvertent mistake.

The third element is that the relationship between the justification Attorney Kilmartin has given and the conduct is not a fit. The reasons he has given are that he was carrying out a mandatory professional duty to disclose professional misconduct and/or criminal conduct, and to disqualify the opposing lawyer. The factual findings show that he did not do the actions that would have accomplished the first objective, including filing a report with the designated body to investigate and act upon it and pursuing complaints of criminal conduct with law enforcement or prosecutorial personnel. In addition, the objective of mandatory disclosure of professional misconduct does not explain why such material was filed on three separate occasions, and required the filing of 42 pages with confidential mediation communications (31 separate documents, with duplications resulting from fax and hard copies).

As to the second objective (seeking to disqualify opposing counsel for perceived unethical behavior), there were standard procedural techniques available for pursuing that objective without disclosing confidential settlement communications: referencing the ethical problem in general terms without revealing the details in the public record, seeking a protective order from the court to seal factual confidential material, and/or requesting a hearing on the motion to be closed to prevent public access to confidential evidentiary material. The connection that is claimed between the justifications given and the actions actually undertaken is not supported by the evidence.

The fourth element is that the conduct was done for an improper purpose. The factual

---

[20]The court itself acted to protect the confidentiality of the parties' settlement discussions, which was necessary to facilitate settlement, by temporarily sealing the portions containing confidential settlement communications.

findings show a clear history of personal and professional attacks on Attorney Caldbeck. Beginning in April of 1998, Attorney Kilmartin took almost every opportunity available to file motions impugning Attorney Caldbeck's professionalism in conducting the case, and beginning in May of 1998 Attorney Kilmartin began a series of attempts to seek to disqualify him. The conduct at issue here took place in the context of the third such attempt. As the facts show, the negative dynamic between the two attorneys took on a life of its own, and drove many actions of the attorneys.

The letter from Attorney Valsangiacomo to the court on August 3rd, stating that the insurance company had authorized Attorney Valsangiacomo to sign the stipulation for dismissal without the necessity of Attorney Kilmartin's signature, shows that Attorney Kilmartin's own client was aware that Attorney Kilmartin's motivations for some of his actions were not undertaken for client benefit. The facts also show that the conduct at issue was not appropriate conduct in connection with furthering the administration of justice, either in relation to the procedures for discipline of attorneys, or in relation to proper techniques for a motion to disqualify opposing counsel based on evidence that is confidential.

Attorney Caldbeck has claimed that the improper purpose was to try the case in the press. While it appeared that this might have been an issue in the early part of the case, the facts do not suggest that by July of 1998 there was trial advantage to be gained by the Defendants in publicizing either information about Attorney Caldbeck's conduct at the mediation session or the proposed written settlement agreement. The terms had essentially been agreed upon. Moreover, the content of the filed material was not related to orienting the public to the facts of the case. Rather, the focus of the confidential material filed was on alleged misconduct by Attorney Caldbeck. It is clear that Attorney Kilmartin had reached his own conclusion that Attorney Caldbeck had committed professional misconduct, but he had not succeeded in persuading the Superior Court to assume responsibility for administering the ethical misconduct allegation as a disciplinary matter, or to disqualify Attorney Caldbeck. Thus, the improper purpose appears to be a combination of simply vexing Attorney Caldbeck and bringing to public attention Attorney Kilmartin's claim that Attorney Caldbeck had engaged in unprofessional conduct during the case. In other words, the purpose was not to try the case in the press, but to use a public record to publicize Attorney Caldbeck's alleged misconduct. The conduct is consistent with Attorney Kilmartin's ongoing effort to remove Attorney Caldbeck from the case.

The final element is that the conduct continued a long-standing pattern of ill-will toward Attorney Caldbeck. In an unnecessary manner, Attorney Kilmartin's filings in the case included many allegations of unprofessional conduct and direct attacks on the character and professional reputation of Attorney Caldbeck. This pattern began early in the case, and continued despite admonishments from the court.

Therefore, the court concludes that Attorney Kilmartin's conduct in filing mediation communications three times when the case was about to settle was not done to discharge a mandatory duty to report unethical conduct to the appropriate investigatory tribunal, nor to disclose potentially criminal conduct to the appropriate authorities, nor was it necessary to do so

in order to pursue a motion to disqualify opposing counsel . Rather, the review of the facts of the case show that the following purposes are the ones consistent with the actual facts: vexing opposing counsel, knowing that Attorney Caldbeck would be upset and confounded in his attempts to reach a timely settlement of Plaintiffs' claims; and pursuing his campaign to discredit and disqualify Attorney Caldbeck on professional misconduct grounds, elevating that goal over the interests of his own clients in finalizing the imminent settlement of the case.

The court has now had the opportunity to examine more closely Attorney Kilmartin's evidence and explanation of his actions in conjunction with having prepared the above specific findings and having reviewed pertinent case law. Such closer examination has produced a conclusion that is essentially the same as that reached on September 2, 1998. As the above account shows, the facts and circumstances of the case consist of details from a lengthy series of case events, and call upon the court to infer facts from other facts in a manner that requires extended explanation to describe. Having presided over nearly the entire case and reached a conclusion of 'bad faith' initially without specifying its elements, and now again on the basis of a detailed dissection of the facts, this court concludes that the evidence is clear that the conduct at issue was done in bad faith.

The remand has given the court the opportunity to review whether the facts support the specific sanction imposed. As described in detail in the transcript of the sanctions hearing on September 2, 1998, the basis of the sanction was compensation to the public for the costs of improper use of public resources, specifically five days worth of court time. Although at the hearing on September 2, 1998, the court itself described the sanction at one point as being "in the form of a fine," (Transcript, page 33), the lengthy specific explanation in the transcript makes clear that the amount was determined based on a theory of compensation for unnecessary consumption of public resources, and not on a punitive basis.[21] No appeal was taken as to the amount or compensatory basis for the sanction.

Grounding a sanction on specific cost consequences of the conduct, as was done here despite the use of the word "fine," provides both a nexus and a limit on the terms of the sanction. *Eash*, 757 F.2d at 565 (upholding monetary sanction against attorney based on the misuse of court resources, specifically the cost of impaneling a jury for one day). Also see *Mackler*, 146 F. 3d at 130 (full panoply of criminal procedure safeguards not required with respect to $45,000 compensatory sanction). Having reviewed the specifics of the sanction in light of this more detailed analysis as to its basis, the court is satisfied that the sanction represents a reasonable compensatory amount for the impact on the use of public resources of the sanctionable conduct.

---

[21]During the five days worth of time it took the court staff and judge to attend to the improperly filed material, other litigants' cases could have been furthered.

**Order**

Pursuant to the Memorandum Decision of the Vermont Supreme Court, the court has held an additional hearing, reviewed additional legal arguments, and made written findings and conclusions on the issue of bad faith. Based on these findings and for the foregoing reasons, the court confirms its Order of September 2, 1998.

Dated this        of January, 2003.

Mary Miles Teachout
Superior Judge